Sigmund Snyder and Esther Snyder et al. [1] v. Commissioner. Snyder v. Commissioner
Docket Nos. 43615, 43618, 43713, 45890, 45891. 1955-293.
United States Tax Court
T.C. Memo 1955-293; 1955 Tax Ct. Memo LEXIS 46; 14 T.C.M. (CCH) 1126; T.C.M. (RIA) 55293; October 28, 1955
*46 (1) In the circumstances of this case, held, that the Commissioner was not justified in reconstructing gross income from bookmaking operations in an amount equal to 14 per cent of gross receipts from bettors. (2) Held: Petitioner, A. Schavel, failed to prove that $9,000 of payments received in 1945 was not income. (3) Held: Respondent failed to prove that part of any deficiency was due to fraud with intent to evade tax. (4) Held: The applicability of section 294(d) will be agreed upon by the parties under Rule 50. (5) Held: Deficiencies for 1945 are barred. Deficiencies for 1948 are not barred; section 276(b). The parties will agree under Rule 50 whether or not section 275(c) applies with respect to deficiencies for 1946 and 1947. Robert N. Gorman, Esq., 808 Traction Building, Cincinnati, Ohio, for the petitioners. Robert E. Johnson, Esq., and Charles B. Norris, Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: The Commissioner determined deficiencies in income tax and penalties, as follows: Docket No.
Years
Deficiency
Sec. 293(b)
Sec. 294(d)
45890
S. Snyder
1945
$ 849.10
$ 424.55
$ 248.84
1946
26.00
13.00
1947
1,383.89
691.95
82.37
1949
1,283.73
641.87
78.70
43615
S. Snyder
1948
2,175.30
1,087.65
117.01
1950
1,661.82
830.91
90.10
45891
J. Schavel
1945
2,607.92
1,303.96
122.04
1946
7,978.18
3,989.09
645.23
1947
9,087.43
4,543.71
542.78
1948
5,958.03
2,979.02
263.77
43618
J. Schavel
1949
3,079.92
1,539.96
513.96
1950
6,351.68
3,175.84
375.40
43713
A. Schavel
1945
11,157.20
5,578.60
1946
8,678.05
4,339.03
553.38
1947
10,466.97
5,233.49
662.93
1948
6,334.79
3,167.39
163.52
1949
4,133.66
2,066.83
223.74
1950
9,413.67
4,706.83
1,611.19
*47 The chief issues are as follows: (1) Whether petitioners realized additional "handbook income" in each of the taxable years which they omitted from taxable income in their respective returns. (2) Whether the sum of $9,000 paid or credited to Alex Schavel in 1945 by the Hangar and Barn Restaurants constituted taxable income. (3) Whether any part of any deficiency was due to fraud with intent to evade tax. (4) Whether additions to tax under section 294(d) are due for any year from each petitioner. (5) Whether the deficiencies determined for 1945 to 1948, inclusive, are barred by the statute of limitations. Several adjustments determined by the respondent have not been placed in issue or have been conceded by the respective petitioners. The petitioners in Docket Nos. 43615, 43713, and 45890, claim to have made overpayments of tax for the taxable years. Findings of Fact We find the facts as stipulated. The stipulation of facts is incorporated herein by this reference. The petitioners are residents of Cincinnati, Ohio. Joseph Schavel filed separate returns for the years 1945 to 1948, inclusive. Joseph and Jean filed joint returns for the years 1949 and 1950. Alex Schavel filed separate *48 returns for each of the taxable years. Sigmund Snyder filed separate returns for the years 1945, 1946, 1947, and 1949, and Sigmund and Esther filed joint returns for the years 1948 and 1950. All of the returns were filed with the collector for the first district of Ohio. Since the facts in these proceedings relate only to Joseph Schavel, Alex Schavel, and Sigmund Snyder, they are referred to hereinafter as the petitioners. Joseph and Alex Schavel are brothers. Sigmund Snyder is their brother-in-law. During each of the taxable years, Joseph and Alex Schavel operated several handbooks in the area of Cincinnati, Ohio, for the acceptance of bets on horse races. Each had a 50 per cent interest in the earnings of the handbook operation. Alex Schavel also owned an interest in the Barn Restaurant, and he operated the Schavel Realty Company, which owned the real estate on which the Barn Restaurant is located. In 1945, Snyder operated one of the Schavels' handbook locations. In the years 1947 to 1950, inclusive, he operated his own handbook location with a person named "Beck", under an arrangement whereby each had a 50 per cent interest in the handbook earnings. The bookmaking activities of *49 the Schavels were carried on in conjunction with several bookmakers, or operators, who were located in cafes, cigar stores, or similar establishments in Cincinnati. On business days, these bookmakers would accept wagers at their respective locations and call the wagers in to the Schavels' "clearing office" in nearby Norwood, Ohio. The number of operators who telephoned wagers to the Schavels' office ranged from 3 to 5 during the taxable years. The arrangements which the Schavels had with the operators varied. The operators were paid either a salary, or a salary plus commission, or 50 per cent of the profits from the business done at their respective locations. The profit realized at a location was determined by subtracting payouts on winning bets and certain expenses of the location, such as rent and telephone, from the wagers, or gross income, received at the location. The Schavels' arrangement with the operators worked out as follows: The operator of a location telephoned the details of each wager he accepted to the Norwood office, where the details would be recorded on a long sheet of paper by an office man, an employee. A separate sheet was kept for each location. The details *50 communicated to the office man, which he recorded, included the name, or some other identifying symbol, of the bettor; the horse bet on; the amount wagered; and whether the bet was to win, place, or show. Each office man recorded the wagers called in by one location, but if he was not too busy, he recorded the wagers called in by two locations on separate sheets. When the race results became known, the office man would inform the operator, by telephone, of the names, or symbols, of the bettors who had winning bets, and of the amount of the bettor's "hit", i.e., the amount payable on a winning wager. The operator paid out the hits, or winning wagers, in cash. The amounts of the bets accepted by the operators ranged from approximately 50 cents to $10. Winning bettors were paid track odds on the first $2 of a wager; on the amount wagered in excess of $2, track odds were paid up to a limit of 20-to-1 for "win" bets; 8-to-1 for "place" bets, and 4-to-1 for "show" bets. At the end of the day, the office man informed the operator of the results of the location's betting activities for the day. This information included the total "play", or gross wagers accepted, at the location; the total *51 amount of hits sustained; and the amount of the resulting net win or loss for the day. In computing the total amount of hits, the office man included therein not only the sums paid out to winning bettors, but also the expenses paid at the location for such things as racing records, telephone, rent, and other expenses. Ceil Oxlander is a sister of the Schavels. She studied bookkeeping all through high school, and she took a one-year course in accounting at the University of Cincinnati. Ceil was the bookkeeper for the Schavels during the taxable years. The permanent records kept by Ceil for the Schavels consisted of a looseleaf book containing pages with columns under printed headings. She maintained a similar record for Snyder, beginning in 1947, when he commenced operating a handbook on his own. The book kept for the Schavels was arranged by years, and several pages for each year were allotted to each of the operators with whom the Schavels dealt. For each day, Ceil Oxlander entered the date, the operator's total play and hits, and the resulting win or loss for the day. At the end of each week, she computed the totals for the week and determined the "split", or the Schavels' portion *52 of the winnings for the week. In the event the result for the week was a loss, the loss was carried over to succeeding weeks until a profit for a week was again shown. Ceil received the information and figures which she entered in the permanent accounting records from the Norwood office. Each day someone at the Norwood office would advise Ceil by telephone of the amounts of each operator's total play, total hits, and net win or loss, as the case might be for the day. Ceil recorded these amounts in the permanent accounting records. She saw, from time to time, some of the detailed betting sheets. In the State of Ohio, under the provisions of section 13062 of the Ohio Revised Statutes, it is illegal to take wagers on horse races, and, inter alia, to keep a room where there are books or apparatus for recording such wagers. The detailed betting sheets compiled at the Norwood office by the office men were disposed of after about one month, because the Schavels feared that the sheets would be seized by police authorities and used as evidence in legal proceedings growing out of their illegal bookmaking activities, The sheets were retained in the first instance for about one month as a check *53 in the event a bettor claimed a hit on a previous day. The following entries for the five weeks beginning October 1, 1945, for an operator named "Sig" are illustrative of the entries made by Ceil Oxlander in the Schavels' permanent record: Sig
[Date]
[Play]
[Hits]
[Net Win or Loss]
[Split]
10 1
408.50
184.90
223.60
2
497.00
418.30
78.70
3
594.50
375.50
219.00
4
331.00
264.20
66.80
5
561.50
616.95
(55.45)
6
515.00
576.75
(61.75)
2,907.50
2,436.60
470.90
235.45
8
259.50
250.20
9.30
9
240.50
122.10
118.40
10
365.50
281.85
83.65
11
348.50
296.50
52.00
12
535.00
650.00
(115.00)
13
534.50
445.40
89.10
2,283.50
2,046.05
237.45
118.70
15
527.00
348.30
178.70
16
452.50
315.25
137.25
17
556.50
1,412.65
(856.15)
18
834.00
844.55
( 10.55)
19
587.00
957.35
(370.35)
20
520.50
481.15
39.35
88175
3,477.50
4,359.25
(881.75)
22
450.00
277.35
172.65
23
727.00
375.70
351.30
24
539.50
346.50
193.00
25
504.00
302.50
201.50
26
472.00
319.55
152.45
27
496.50
467.70
28.80
3,189.00
2,089.30
1,099.70
108.95
29
490.00
393.30
96.70
30
363.50
340.45
23.05
31
809.50
674.15
135.35
11 1
365.50
271.20
94.30
2
502.50
513.05
(10.55)
3
329.00
338.95
( 9.95)
2,860.00
2,531.10
328.90
164.45
627.55 In the case of operators with whom the Schavels had an arrangement other than for the sharing of profits, such as "John" and "Joe" in 1945, and "Club" in 1946, the entire *54 profit for the week was listed as a "split" for the Schavels. The petitioners' shares of the bookmaking winnings were paid by the operators to Ceil Oxlander. The amounts of money she received from the operators for the petitioners corresponded to the petitioners' shares of the profits shown on the permanent accounting records which she kept. The permanent bookmaking records maintained by Ceil also listed the expenditures made by the petitioners for salaries, taxes, racing service, telephones, and miscellaneous expenses incurred at the Norwood office. The petitioners' returns for the taxable years were prepared by Boris Dunsker, a certified public accountant. He computed the petitioners' bookmaking income in each year from a trial balance sheet prepared by Ceil. The amounts of income from bookmaking reported by the petitioners in each of the taxable years were as follows: Year
Petitioner
1945
1946
1947
1948
1949
1950
Alex Schavel
$2,605.63
$10,889.13
$9,962.79
$3,925.98
$6,796.56
$4,650.46
Joseph Schavel
2,605.63
10,889.14
9,962.80
3,925.99
6,796.56
4,650.47
Sigmund Snyder
3,529.75
1,454.30
5,103.15
4,469.65
4,828.85
4,326.70 The amounts of petitioners' bookmaking income for the taxable years were computed as *55 follows: Alex and Joseph Schavel
1945
1946
1947
1948
1949
1950
"Total
$12,350.70
$38,088.40
$40,270.45
$26,953.50
$35,228.40
$26,572.80
income"
Expenses
7,139.44
16,310.13
20,344.86
19,101.53
21,635.28
17,271.87
"Net
$ 5,211.26
$21,778.27
$19,925.59
$ 7,851.97
$13,593.12
$ 9,300.93
profit"
Distributio
n: Alex
$ 2,605.63
$10,889.13
$ 9,962.79
$ 3,925.98
$ 6,796.56
$ 4,650.46
Schavel
Joseph
2,605.63
10,889.14
9,962.80
3,925.99
6,796.56
4,650.47
Schavel
Sigmund Snyder
Share as an
$ 3,529.75
$ 1,454.30
operator
for
Schavels
Bookmaking
$ 5,040.80
$ 5,669.65
$ 5,188.60
$ 4,454.15
income
Personal
1,742.35
840.25
832.55
wagering
Total
$ 3,529.75
$ 1,454.30
$ 6,783.15
$ 5,669.65
$ 6,028.85
$ 5,286.70
wagering
income
Expenses
1,680.00
1,200.00
1,200.00
960.00
Net
$ 3,529.75
$ 1,454.30
$5,103.15
$ 4,469.65
$ 4,828.85
$ 4,326.70
wagering
income
There were no discrepancies between the amounts of the "total income" from bookmaking reported by the Schavels and the amounts of their shares of the bookmaking profits recorded in the permanent bookmaking records maintained by Ceil, except that the reported bookmaking income for the years 1947, 1948, 1949, and 1950, includes rental income in the respective amounts of $1,680, $1,200, $1,200, and $1,320. The rental income had been recorded *56 separately in the accounting records maintained by Ceil. The amount of Snyder's winnings from "personal wagering" in 1948, $25.05, was not included in the wagering income he reported in his return for that year. Other than this omission, there were no discrepancies between the amounts of the total wagering income reported by Snyder for the taxable years and the amounts of bookmaking income recorded in the records kept for him by Ceil. In 1949 and 1950, the hit totals recorded in the permanent bookmaking records included certain expenditures for air conditioners and television sets, in addition to the amounts paid to winning bettors and paid for operating expenses at the locations. The petitioners' shares of the appliance expenditures which were recorded as hits are as follows: Purpose for
Year
Petitioner
Amount
which spent
1949
A. & J. Schavel
$1,076.00
Air conditioner
1949
Snyder
538.00
Air conditioner
1950
A. & J. Schavel
122.96
Television set
1950
Snyder
242.83
Television set The air conditioners and television sets were installed at the business premises of the petitioners. The respondent determined that the hits recorded in the permanent bookmaking records, on the basis of which the respective amounts *57 of the petitioners' bookmaking income was computed and reported, could not be substantiated. The respondent determined that 86 per cent of play constituted a "reasonable" allowance each year for hits sustained in the petitioners' operations, and he redetermined the amounts of petitioners bookmaking income by disallowing the amounts of all hits recorded in the permanent bookmaking records in excess of 86 per cent of the recorded play. The total amount of hits disallowed for each year by the respondent, and the amounts by which the respondent increased the bookmaking income of Alex and Joseph Schavel for each of the taxable years are as follows: Increase in Book-
making Income Deter-
mined by Respondent * *58 Total Hits
Disallowed by
Alex
Joseph
Year
Respondent
Schavel
Schavel
1945
$23,439.64
$ 8,489.90
$ 8,489.90
1946
36,217.97
15,310.73
15,310.72
1947
45,632.46
18,456.82
18,456.81
1948
38,024.92
15,310.03
15,310.02
1949
29,128.90
11,256.98
11,361.98
1950
50,382.97
20,807.70
20,807.69
The respondent disallowed the amounts of hits in excess of 86 per cent of the play recorded for Snyder's operations for each year, and increased the amounts of Snyder's bookmaking income in the following amounts: 1945
$3,023.90
1947
5,014.61
1948
8,240.73
1949
5,163.42
1950
8,318.05
The respondent's determination that 86 per cent of play was a reasonable allowance for hits was based upon the operations of race tracks using parimutuel machines under state supervision. The respondent determined that at such tracks, an average of 85.72 per cent of wagers is returned to bettors, and that an average of 14.28 per cent of wagers is retained by the track and by the state. The payouts to winning bettors on hits and the current expenses of the bookmaking locations exceeded 86 per cent of the wagers accepted by the petitioners. With the exception of the expenditures for air conditioners and television sets set forth above, the hits recorded in the permanent bookmaking records maintained by Ceil Oxlander correctly set forth the payouts on hits and for the current expenses of the locations during each of the taxable years. On December 31, *59 1945, Ceil Oxlander credited Alex Schavel's account on the books of the Barn Restaurant in the amount of $5,000 and debited the account for purchases of whiskey in the same amount. Alex Schavel did not purchase whiskey for the Barn Restaurant in the amount of $5,000, or lend the restaurant that amount for the purchase of whiskey. In 1945, Alex Schavel received 2 certified checks for $2,000 each, dated September 5, 1945, from Ceil Oxlander. This transaction was recorded on the books of the Hangar Restaurant, which was owned by Alex Schavel's brother-in-law and two sisters, as a credit to cash in the amount of $4,000 and a debit in the same amount to purchases of whiskey. No entry was made on the Hangar Restaurant's books crediting Alex Schavel's account, nor had any entry previously been made showing an account payable to Alex Schavel in the amount of $4,000. The respondent determined that the $5,000 credit to Alex Schavel's account on the books of the Barn Restaurant and the receipt of the certified checks constituted taxable income to Alex Schavel in 1945 in the total amount of $9,000. Sigmund Snyder realized gains from personal gambling transactions in 1948 in the amount of $25.05 *60 which he failed to report in his income tax return. The petitioners had unreported income from interest and dividends in the taxable years in the following amounts: 1945
1946
1947
1948
1949
1950
Alex Schavel
Interest
$ 12.75
$ 43.65
$ 65.74
$ 66.38
$ 84.45
$39.45
Dividends
521.68
839.32
Joseph Schavel
Interest
33.54
46.07
16.13
25.94
21.55
19.80
Dividends
100.00
35.30
30.00
Sigmund Snyder
Interest
82.00
107.62
115.82
173.91
148.67
68.80
In 1945, Alex Schavel had unreported capital gain in the amount of $521.68 from the sale of jewelry. In 1947, he realized capital gains in the amount of $153.39 from the sale of stock, and $75 from the sale of an automobile, all of which he failed to report in his return. Alex Schavel did not sustain allowable capital losses in the amount of $1,000, or in any other amount, in 1949 and 1950, as a result of alleged transactions with a partnership composed of himself and Fay Rothring. However, he sustained an allowable capital loss of $1,000 from the disposition of stock in 1950 which he failed to deduct in his return. The bookmaking records maintained by Ceil Oxlander at some time prior to the taxable years showed only the net amounts of win or loss for a day, and they did not include a *61 record of the daily play and hit totals. These records were examined by an agent of the respondent in connection with an investigation by the respondent of the tax liability of one of the operators. Ceil Oxlander was advised at this time that she should also keep records of the daily play and hit totals. No part of any deficiency in any taxable year was due to fraud with intent to evade tax. The petitioners have pleaded the statute of limitations as a bar to the deficiencies determined by the respondent for the years 1945, 1946, 1947, and 1948. Consent agreements extending the applicable period for assessment of tax were executed for several of the years. The following table lists the dates on which returns were filed; the dates on which consent agreements were executed; the last date for assessment fixed by the consent agreements; and the date on which the respondent's statutory notice of deficiency was issued: Last Date
Year
Date
Date
for Assess-
Date of
Ending
Return
Consent
ment Per
Deficiency
Docket
Petitioner
12/31
Filed
Executed
Consent
Notice
43713
A. Schavel
1945
3/15/46
6/23/52
43713
A. Schavel
1946
3/15/47
1/30/52
6/30/53
6/23/52
43713
A. Schavel
1947
3/15/48
6/23/52
43713
A. Schavel
1948
3/14/49
1/30/52
6/30/53
6/23/52
45891
J. Schavel
1945
3/15/46
6/18/52
45891
J. Schavel
1946
3/15/47
1/30/52
6/30/53
6/18/52
45891
J. Schavel
1947
3/15/48
6/18/52
45891
J. Schavel
1948
3/14/49
1/30/52
6/30/53
6/18/52
45890
S. Snyder
1945
3/15/46
6/19/52
45890
S. Snyder
1946
3/15/47
1/30/52
6/30/53
6/19/52
45890
S. Snyder
1947
3/15/48
6/19/52
43615
S. & E. Snyder
1948
3/15/49
1/30/52
6/30/53
6/19/52
The *62 petitioners filed declarations of estimated tax for each taxable year with the exception of Snyder, who failed to file a declaration for the year 1945. No petitioner filed a false or fraudulent return with intent to evade tax for any of the years 1945-1948, inclusive. The following stipulation was entered into by the petitioners. It includes some of the findings heretofore made and, accordingly, is, in part, a repetition of findings made above. It is set forth, nevertheless, for clarity. "1. It is stipulated by Alex Schavel that he owes income tax on the following items of unreported income, in the amounts set forth, and that the respondent properly disallowed certain deductions: "1948
"Unreported Interest
$ 66.38
Wall Carpeting
839.32
$ 905.70
"1949
"Unreported Interest
$ 84.45
Capital Loss - Disallowed
1,000.00
Air Conditioner expense dis-
allowed $538.00 less $17.93
depreciation
520.07
$1,604.52
"1950
"Unreported Interest
$ 39.45
Television expense disallowed
$61.48 less $6.14 depreciation
55.34
Capital Loss of $1,000 offset
by capital loss of $1,000 on
Distinctive Products stock,
not reported
Less Depreciation on Air
Conditioner
(53.80)
$ 40.99
"2. It is stipulated by Joseph and Jean Schavel that they owe income *63 tax on unreported items of income, in the amounts set forth below, and that respondent properly disallowed certain deductions: "1948
"Unreported Interest
$ 25.94
$ 25.94
"1949
"Unreported Interest
$ 21.55
Air Conditioner expense dis-
allowed $538.00 less $17.93
depreciation
520.07
$541.62
"1950
"Unreported Interest
$ 19.80
Television expense disallowed
$61.48 less $6.14 depreciation
55.34
Less Depreciation on Air
Conditioner
(53.80)
$ 21.34
"3. It is stipulated by Sigmund and Esther Snyder that they owe income tax on unreported items of income in the amounts set forth below, and that the respondent properly disallowed certain deductions: "1948
"Unreported Interest
$ 173.91
Personal Gambling Gains
25.05
$198.96
"1949
"Unreported Interest
$ 148.67
Air Conditioner Expense dis-
allowed $538.00 less $13.45
depreciation
524.55
$673.22
"1950
"Unreported Interest
$ 68.80
Television expense disallowed
$242.83 less $24.28 deprecia-
tion
218.55
Less Depreciation on Air
Conditioner
(53.80)
$ 233.55"
Opinion The following questions are to be decided: (1) Whether the respondent correctly determined that the petitioners understated their income from bookmaking operations during each of the taxable years. (2) Whether the sum of $9,000, paid or *64 credited to Alex Schavel in 1945 by the Hangar and Barn Restaurants, constituted taxable income to him in 1945. (3) Whether the respondent properly determined additions to the deficiencies and additions to tax under the provisions of sections 293(b) and 294(d) of the 1939 Code. (4) Whether determinations of deficiencies for any of the years 1945 to 1948, inclusive, are barred under the provisions of section 275(a) or section 275(c) of the 1939 Code. Issue 1: The respondent has accepted the amounts of gross receipts, or gross play, as entered in the permanent accounting records maintained by Ceil Oxlander. However, he has recomputed, in each year, the total amounts of hits. He determined that in each year only 86 per cent of the total play was paid out to winning bettors, and, accordingly, that 14 per cent of the amount of the gross play was retained by petitioners. On this basis, the respondent has, in effect, disallowed part of the payouts, and he has increased the income of each petitioner. The respondent's disallowance of all hits in excess of 86 per cent of play is predicated upon his determination that the petitioners failed to maintain records adequate to substantiate the amounts *65 of hits recorded in the books kept by Ceil Oxlander. The respondent points to the destruction of the detailed daily betting sheets containing the details of each bet called in to the central office, and to the petitioners' admission that the amounts of hits shown in the accounting books included not only payouts to winning bettors, but also operating expenses of the locations, and the purchase price of air conditioners and television sets. The petitioners concede that the cost of the air conditioners and television sets as set forth in the Findings of Fact should have been capitalized, rather than deducted as current expenses. The respondent's determination of the amounts of the petitioners' bookmaking income makes no allowance for deduction of operating expenses of the locations. This appears to be on the ground that the petitioners failed to substantiate the payment of such expenses. The petitioners claim that items of expenses were listed separately on the detailed betting sheets but were included in the total of the daily amounts of hits, or payouts, which were called in to Ceil Oxlander, and which were entered by her in the permanent bookmaking accounting records. The bookmaking *66 income reported by the petitioners was computed by Ceil Oxlander from the entries in her permanent accounting records for play, hits, and business expenses at the Norwood office, and on the basis of the allocation of profits agreed upon by and between the petitioners and the operators, and among the petitioners themselves. Except for some minor errors which are now conceded by petitioners, there are no discrepancies between the amounts which each petitioner reported in his income tax return for each year as income from bookmaking operations, and the amounts of net income from such operations which appear in the accounting records kept by Ceil. The accounting records which were maintained are clear and consistent, and from them it is possible to determine the taxable income of each of the petitioners from bookmaking operations. The problem is whether the accounting records should be disregarded because the daily betting sheets were destroyed. In dealing with a comparable situation involving the substantiation of net figures in the absence of detailed betting sheets, this Court said in : "True, petitioner had destroyed the sixty-line sheets and thus *67 has made the Commissioner's task of auditing the returns immeasurably more difficult than it should be. This is conduct that is not to be condoned. Perhaps the Treasury should seek and the Congress should provide it with appropriate and effective sanctions, civil or criminal or both, against taxpayers who fail to keep or who do away with important records bearing on their liability. But, under the law as it now stands we are not empowered to approve deficiencies merely because records have been destroyed. Of course, the destruction of records is a factor that may be taken into account in various circumstances such as the determination of fraud, and it may justify the Commissioner in using some reasonable method of reconstructing a taxpayer's income, with the burden upon the taxpayer to show that the Commissioner is in error. * * *" The respondent has disregarded petitioner's books and has determined that the petitioners realized gross winnings equal to 14 per cent of all wagers accepted by the bookmakers. We have heretofore dealt with the same or similar problem where the basis for the respondent's determination has been the destruction of original betting sheets. We have observed, *68 in cases where the respondent has adopted the method of limiting the allowable amount of payouts to winning bettors to a certain percentage of the gross play, which percentage is the same as the percentage of payouts at race tracks, that an assumption is made by the respondent which misconceives the position of a bookmaker. A bookmaker gambles a stakeholder. ; (June 30, 1955). In this case, the percentage of 86 per cent of gross play adopted by the respondent is based upon the composite percentage of payouts at various parimutuel tracks in the United States. The petitioners shared profits with the various bookmakers who called in their bets to the Norwood office. Of controlling significance in this case is the fact that the amounts paid over by the bookmakers to Ceil Oxlander as petitioners' shares of profits equalled the "splits" recorded for the petitioners in her records. Also, there is no evidence before us of concealment of bookmaking income, false accounting records, or of expenditures or savings by the petitioners in amounts greater than their reported income. It is concluded on the basis of the entire record that respondent's *69 determinations were wholly arbitrary as applied in this case, and that petitioners' records should not be disregarded. The parties have agreed upon the cost of the air conditioners and television sets purchased in 1949 and 1950, and upon the amounts of depreciation allowable with respect to these items. In the Rule 50 recomputation, the hit totals for 1949 and 1950 will be reduced in the amount of the cost of these items, and the depreciation agreed upon by the parties will be allowed. Except for these adjustments, respondent's determinations increasing the petitioners' income from bookmaking cannot be sustained. We are satisfied from the entire record that other expenses of carrying on the business were proper. Issue 2: The next question to be decided is whether the sum of $9,000 paid or credited to Alex Schavel in 1945 by the Barn and Hangar Restaurants constituted taxable income to him in that year. Schavel does not deny the receipt of the credits and payments, but contends that they constituted repayment of cash loans made by him in 1944 to the restaurants to enable the latter to purchase whiskey. Under this issue, the petitioners have the burden of proof. The evidence shows that *70 Schavel failed to obtain any receipts or other acknowledgment from the restaurants in 1944 for the purported loans. Also, there were no entries made in the restaurants' books for 1944 indicating an indebtedness to Schavel. The evidence does not sustain petitioner's contention. It is concluded that the respondent properly determined that the $9,000 in question constituted taxable income to Alex Schavel in 1945. Other adjustments which were made by the respondent have not been contested, or they have been conceded by the petitioners. These adjustments pertain to unreported amounts of dividends, interest on savings accounts, and capital gains and losses, and are set forth in the findings. Issue 3: The respondent determined 50 per cent penalties for each of the taxable years under the provisions of section 293(b) of the 1939 Code. The respondent has the burden of proving that part of a deficiency is due to fraud with intent to evade tax. The evidence necessary to establish fraud must be clear and convincing. , certiorari denied, ; . Deficiencies in tax standing alone do not establish *71 fraud. We have carefully examined the entire record, and we conclude that no part of any deficiency was due to fraud with intent to evade tax. Under this issue the respondent has failed in his burden of proof. The respondent stresses the destruction of the detailed betting records as evidence of a wilful intent to evade tax. The destruction of these detailed records may raise suspicion that the petitioners intended to conceal the true facts concerning their bookmaking income. On the other hand, the petitioners' bookmaking activities, of which the detailed betting sheets constituted evidence, were illegal under the law of Ohio, and the destruction of the records is equally consistent with the petitioners' avowed desire to avoid seizure of this evidence by police authorities. It is observed, also, that an agent of respondent, who examined the Schavels' accounting books for prior years, made suggestions which were reflected in the accounting records which Ceil Oxlander kept during the taxable years. The respondent also argues that inasmuch as the petitioners knowingly operated an unlawful bookmaking business, it is a fair inference that they "would not hesitate to understate their income *72 in large or small amounts with intent to defraud the United States Government." It is true that the petitioners were engaged in illegal activities, but this fact does not prove that the petitioners deliberately and wilfully understated their income in the taxable years. Fraud is not to be found on the basis of suspicion alone. The respondent has not carried his burden of proving fraud by clear and convincing evidence. The additions to the deficiencies under section 293 (b) cannot be sustained. Issue 4: The respondent determined additions to tax, for each year, under section 294(d)(2) of the 1939 Code. The correctness of the respondent's determination depends on whether 80 per cent of each petitioner's correct tax liability in each year exceeds the estimated tax paid, which is a matter which the parties would have to take up under Rule 50. There must be recomputations of the amounts of income as well as of the correct tax liability of each petitioner under Rule 50. At that time whether or not section 294(d)(2) applies will be ascertained by the parties, and they will comply with the provisions of the pertinent section. See , affd. ; and . *73 For the year 1945, the respondent made addition to the tax owing by Snyder under the provisions of section 294(d)(1)(A). As is shown below, the year 1945 is barred. Issue 5: The final question is whether determinations of deficiencies for any of the years 1945 to 1948, inclusive, are barred. With respect to the year 1945, the determinations of deficiencies are barred unless the return was false or fraudulent with intent to evade tax. Under our holding that the returns were not false or fraudulent with intent to evade tax, it follows that deficiencies for the year 1945 are barred. Under the facts, the 5-year period of limitations, section 275(c) of the Code, applies if any of the petitioners omitted from gross income an amount in excess of 25 per cent of the gross income reported. The applicability of section 275(c) to the years 1946 and 1947 will be agreed to by the parties at the time they make their respective Rule 50 recomputations. The record shows that deficiency notices for 1946 were mailed within the extended period which resulted from the execution of consent agreements within 5 years after the returns were filed. See section 276(b). The statutory notices of deficiencies for *74 1947 were mailed more than 3 years and less than 5 years after the returns were filed. With respect to the year 1948, the deficiency notices were mailed within the extended period provided for in the consent agreements which were executed within 3 years after the returns were filed. See section 276(b). The deficiencies for 1948 are not barred by the statute of limitations. Decisions will be entered under Rule 50. Footnotes
1. The following proceedings have been consolidated with Docket No. 43615: Docket No. 43618, Joseph and Jean Schavel; Docket No. 43713, Alex Schavel; Docket No. 45890, Sigmund Snyder; Docket No. 45891, Joseph Schavel.↩
*. The combined increase determined in the Schavels' bookmaking income exceeds 50 per cent of the disallowed hits because the Schavels had interests in excess of 50 per cent in the operation of locations where the operators were paid a salary or salary plus commission, rather than 50 per cent of the profits.